IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ADRIENNE L. MCADORY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cv-886 (LMB/TCB) |
| | ) | |
| VAIL TECHNOLOGIES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff pro se Adrienne L. McAdory ("plaintiff" or "McAdory") has filed a complaint alleging that she was the victim of pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., inflicted by the defendant VAIL Technologies ("defendant" or "VAIL"), whom she claims was a joint employer. She seeks over $8,000,000.00 in damages. Before the Court is the defendant's Motion for Summary Judgment, in which it argues that VAIL was not plaintiff's employer for Title VII purposes; that plaintiff has failed to establish a prima facie case of pregnancy discrimination and has failed to show that VAIL's legitimate reasons for refusing to renew the contract with her company were pretextual; and that plaintiff cannot prove that she suffered any damages from VAIL's conduct. For the reasons that follow, defendant's Motion for Summary Judgment will be granted.

I. BACKGROUND

McAdory founded ALM Group, Inc. ("ALM Group") in 2004, Def. SUMF, [Dkt. 66] at ¶ 1, and has remained its President, Chief Executive Officer, and sole employee to the present. Def. Ex. 1, [Dkt. 66-1] at 26:25–27:9. Since 2004, ALM Group has entered into at least 11 subcontracts with various entities to provide consulting services. Def. SUMF ¶ 77. VAIL is a

small firm with its principal place of business in Arlington, Virginia, engaged in "providing business systems architecture, systems engineering, software development, and acquisition management services to the [U.S.] Government and other clients." Id. at ¶ 2.

In 2012, VAIL and ALM Group worked together on a proposal for a government contract, under which VAIL would have been the prime contractor and ALM Group would have been a subcontractor; however, they were not selected. Def. SUMF ¶ 3. VAIL and McAdory had no further interaction until 2014.

On January 25, 2013, VAIL was awarded "Contract D0029" "to perform specialized analysis and business systems architecture support for the United States Army Office of Business Transformation" ("OBT"). Def. SUMF ¶ 4. Contract D0029 is an umbrella contract—also known as an indefinite duration, indefinite quantity ("IDIQ") contract—under which the government issues discrete work orders. Each of these work orders is essentially a separate contract. One of those work orders was "Contract D0029-202." Id. at ¶ 10. Although neither party has submitted Contract D0029-202, both have referred to a document entitled "Performance Work Statement for Business Systems Architecture Additional Work Effort" ("PWS") prepared by OBT on May 21, 2014, to define the scope of the project. See Def. Ex. 9, [Dkt. 66-9]; Pl. Ex. 1, [Dkt. 76-1] at 17.

The PWS states that the objective of the project was to focus on "rationalizing and integrating the Army's business system portfolio." Def. Ex. 9, [Dkt. 66-9] at 5. To that end, the project required

> technical expertise to support Government efforts in the following general areas of the Army's Business Architecture: strategic planning, business alignment, IT requirements and acquisition reform efforts; Enterprise Resource Planning (ERP), software implementation and convergence planning; business architecture development, [end-to-end] business process modeling and improvement and business investment governance; technical services to evaluate emerging

2

technologies that could accelerate business transformation; liaison support with
Office of the Secretary of Defense (OSD) Staff, Military Services and Army
Commands; and executing transformation initiatives and activities implementing
business changes that will occur.

Id. at 4–5.

On May 27, 2014, VAIL and ALM Group entered into a "Sub-Contract Agreement & VAIL Work Order" ("Subcontract") under which ALM Group was hired to "perform as a member of VAIL's team providing Enterprise Architecture consulting support to" the OBT. Def. Ex. 8, [Dkt. 66-8] at 1. The Subcontract provided that McAdory would be "deemed key personnel and [would] perform all support from ALM [Group], and [could] only be replaced with personnel that meet qualification requirements of the position and are approved by VAIL." Id. The Subcontract included a paragraph titled "ALM's Relationship to VAIL," which stated:

> ALM's relationship to VAIL is that of a sub contractor. Payments to ALM will
> be reported to the Internal Revenue Service through ALM's EIN. VAIL will
> provide ALM a 1099 tax form at the end of VAIL's tax year. ALM shall be
> responsible exclusively for all reports and obligations relating to tax withholding
> and similar matters.

Id. The Subcontract covered "a period of performance from May 28, 2014 through May 27, 2015," which was the same time period that VAIL would be performing on the D0029-202 work order. Id.; Def. SUMF ¶ 10. Both the work order and Subcontract were ultimately extended by six days, through June 2, 2015. Def. SUMF ¶ 11. ALM Group's billing under the Subcontract was on a "time and materiel basis" at an hourly rate of $100.00, capped at 1920 hours, or $192,000.00. Def. Ex. 8, [Dkt. 66-8] at 1.

Along with ALM Group, four full-time VAIL employees were assigned to work on Contract D0029-202. Def. SUMF ¶ 16; Pl. SUMF ¶ 16. It is undisputed that "VAIL contracted with ALM Group because [McAdory] had a college degree, an active [secret] clearance, a Project Management Professional ('PMP') certification, and years of experience and expertise

3

working with the OBT and its predecessors." Def. SUMF ¶ 18; Pl. SUMF ¶ 18. By contrast, none of the four VAIL employees had experience working with OBT or its sphere of operations. Id.

Plaintiff performed her work under the Subcontract at the government's Polk Building and the Pentagon, and never reported for duty at VAIL's premises. Def. SUMF ¶ 27; Pl. SUMF ¶ 27. Her hours were set by the government, not by VAIL. Def. SUMF ¶ 40; Pl. SUMF ¶ 40. Although plaintiff has alleged that she had to request leave from a VAIL supervisor, at her deposition she admitted that she had no evidence to support that allegation beyond four emails that simply show her notifying the VAIL employee in question that she would be out of the office. Def. Ex. 1, [Dkt. 66-1] at 128:11–132:3. Those emails do not purport to request leave, and there is no evidence in the record that anyone from VAIL either approved or denied the leave referenced in the emails. Id.

In accordance with the terms of the Subcontract, VAIL provided ALM Group with a 1099 tax form, and did not provide plaintiff with a W-2.[1] Def. SUMF ¶ 43; Pl. SUMF ¶ 43. "VAIL did not withhold federal, state, and social security taxes" for either McAdory or ALM Group. Id. at ¶ 42. Between 2014 and 2015, VAIL paid ALM Group a total of $190,100.00. Id. at ¶¶ 43–44. VAIL never provided McAdory with any benefits, as it did for its W-2 employees, and did not maintain any payroll, insurance, or tax records for her. Id. at ¶¶ 45–46.

---

[1] According to the Internal Revenue Service, "employers" use Form W-2 to report "wages, tips, and other compensation paid to an employee," while "payers" use Form 1099 to report "payments made in the course of a trade or business to a person who's not an employee or to an unincorporated business." Form 1099-MISC & Independent Contractors, IRS.gov, https://www.irs.gov/help-resources/tools-faqs/faqs-for-individuals/frequently-asked-tax-questions-answers (last accessed May 1, 2017).

4

VAIL did provide plaintiff with a laptop and a VAIL email account. Def. SUMF ¶¶ 34–35. Although two other 1099 subcontractors were not provided with a laptop (and one was not provided an email account), those subcontractors worked on a different project that did not have the same technical requirements. Id. VAIL also "mistakenly" created business cards for plaintiff because a member of its administrative staff "had not yet been informed" that plaintiff was merely a subcontractor. Id. at ¶ 47. Although plaintiff attended the same training program as the four VAIL employees, VAIL did not pay for her training as it did for the W-2 employees. See id. at ¶ 37; Pl. SUMF ¶ 37.

While working on Contract D0029-202, plaintiff became pregnant. She first informed VAIL of her pregnancy on May 8, 2015. Def. SUMF ¶ 63. The next day, she sent an email explaining that she "had worked out arrangements with her family and was on a waiting list for a daycare[.]" Id. Plaintiff has not alleged that anyone from VAIL ever made any remarks about her pregnancy.

On May 21, 2015, VAIL received a request for proposals from the government for follow-on work associated with Contract D0029-202. Def. SUMF ¶ 66; Pl. SUMF ¶ 66. Shortly thereafter, plaintiff met with a representative from VAIL, who told her that ALM Group was going to be offered a four-month extension of the Subcontract, after which VAIL would begin searching for a W-2 employee to take over ALM Group's responsibilities. Id. Plaintiff expressed an interest in filling the W-2 position, and was told that she would be welcome to apply for the W-2 position after ALM Group's contract extension elapsed. Id.

On June 2, 2015, Contract D0029-202 expired, and plaintiff and all of VAIL's employees assigned to the OBT project had to leave OBT's premises. Def. SUMF ¶ 61; Pl. SUMF ¶ 61.

5

On June 10, the Army awarded VAIL a new work order known as "Contract D0029-0006." Consistent with its May discussion, VAIL offered ALM Group a four-month subcontract under Contract D0029-0006. Specifically, Rick Hudnall ("Hudnall"), VAIL's president, sent ALM Group the proposed four-month subcontract, which included a term of performance from June 11, 2015, to October 10, 2015 and a funding ceiling of $65,280.00. Id. at ¶¶ 52–53. Hudnall's signature was on the bottom of the contract. Def. Ex. 14, [Dkt. 66-14].

Plaintiff replied by email the next day, saying:

> This document puts me at severe risk because pregnancy has often been used as a means to deny women employment. I will be only two months from delivery when the propose[d] contract would have ended. I hope that my significant contributions to the Vail Team expanding this contract are self evident but I think it would be clear to anyone that the work that I did could only be done by a Senior resource well versed in the OBT[.] I will continue to employ my knowledge of the Army . . . to the benefit of Vail over the next year. I have updated and signed the document to reflect this fact.

Def. Ex. 13, [Dkt. 66-13]. Plaintiff attached to that email an edited version of the proposed subcontract. Def. Ex. 15, [Dkt. 66-15]. Using her computer, she unilaterally altered the key terms of the contract by changing the end date to July 10, 2016, and raising the funding ceiling to $195,840.00. Id. She added her signature and, because she had made these changes directly on the version signed by Hudnall, the contract she returned appeared as though Hudnall had agreed to her terms. See id.

When Hudnall saw the revised contract he construed it to be an attempt to forge his signature, and responded a few hours later, writing, "The PDF document you sent is unacceptable, and VAIL is in no way in agreement with it. It is disturbing that you somehow placed my signature on a document which you unilaterally changed the terms of." Def. Ex. 13, [Dkt. 66-13]. Hudnall then withdrew the 4-month offer. Id. Plaintiff replied saying that she "did no more than 'redline' a contract," and expressed her shock that Hudnall "would send a

6

contract that would put a pregnant woman on the street at a time you know it would be impossible to get a job." Id.

The next day, June 12, 2015, she sent another email saying, "I have considered my situation and I am not in a position to turn down work. Are you willing to revisit your offer?" Def. Ex. 16, [Dkt. 66-16]. Hudnall responded that VAIL did "not need additional consulting services at this time," and reminded McAdory to send VAIL an invoice for any unpaid time on the original Subcontract. Id.

Plaintiff has continued to work since VAIL declined to extend a new contract to ALM Group. From July 2015 to August 2015, she worked as a W-2 employee for Alion Science and Technology, with a $123,000 annual salary. Def. SUMF ¶ 71; Pl. SUMF ¶ 71. In August 2015, she began working as a W-2 employee for Summit Technical Solutions at an annual salary of $130,000, where she remained until September 2016. Id. at ¶ 72. ALM Group entered into a new subcontract with a dry cleaning service called Washio, id. at ¶ 78, and in addition to ALM Group, plaintiff is the owner and president of a wedding registry business known as Atgron, Inc, id. at ¶ 73.

Plaintiff seeks over $8,000,000 in total damages, divided among six categories: $306 for time worked on June 11, 2016; $32,460 for the eight weeks, June 11-August 3, 2015, that plaintiff was "out of work;" $20,000 for her inability to obtain a personal credit line; $23,000 for her inability to obtain a business credit line; $2,064,820 for the loss of real property in Lorton, Virginia, sold at a foreclosure sale; and $6,000,000 to compensate for her inability to enter the

Small Business Administration's 8(a) Business Development Program for businesses owned by economically disadvantaged individuals. Compl. ¶ 2.4.c.[2]

## II. DISCUSSION

### A. **Standard of Review**

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has

---

[2] The complaint also suggests that plaintiff believes that defendant's actions caused her to miscarry, although she states that "[t]here is no relief that can compensate for the loss of [her] child." Compl. ¶ 2.4.c.7.

successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). Failure to do so "renders all other facts immaterial" and entitles the movant to judgment as a matter of law. Rhodes, 636 F.3d at 94. Under Fed. R. Civ. P. 56(c), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

### B. Absence of Employer-Employee Relationship

To be liable for employment discrimination, a defendant must have been the plaintiff's "employer." 42 U.S.C. § 2000e-2. Defendant argues that it was not plaintiff's Title VII "employer," and that, instead, her employer was at all times VAIL's subcontractor, ALM Group. Plaintiff responds that her relationship with VAIL was sufficient to make VAIL a joint employer with ALM Group.

The Fourth Circuit has adopted a nine-factor "hybrid" test to determine whether a person is jointly employed. The factors are:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer

9

furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

Butler v. Drive Automotive Indus. of Am., 793 F.3d 404, 414 (4th Cir. 2015). When evaluating these factors, the "common-law element of control remains the 'principal guidepost' in the analysis." Id. The Fourth Circuit has singled out three factors as "the most important:" who has the power to hire and fire; who controls day-to-day supervision; and who determines "where and how the work takes place." Id.

Plaintiff relies primarily on the third and seventh factors to support her claim that VAIL was a joint employer. Specifically, she points to VAIL providing her with a laptop, an email account, and business cards, and she argues that her work assignments resembled those of the full-time VAIL employees assigned to the same project. These facts are not enough to establish that VAIL was the plaintiff's joint employer. Plaintiff's work assignments resembled those of the VAIL employees because they were all receiving their marching orders from the Army OBT, which undermines her claim that she was jointly employed by VAIL. Plaintiff has also listed tasks that VAIL assigned her supposedly falling outside the scope of the Subcontract, see Pl. Ex. 1, Dkt. [76-1] at 14, but all of those tasks fell squarely within the objectives of Contract D0029-202 as defined by the PWS, see id. at 20. Regarding the materials supplied, one-time provision of basic materials provides little, if any, support for a finding of a joint employment relationship.

Moreover, the remaining seven factors, including all three of the "most important" factors, lean heavily on the side of a contractor-subcontractor relationship. For example, VAIL could not fire McAdory because the contract was between VAIL and ALM Group. Although the

10

Subcontract included a termination-at-will clause giving either party the power to end the Subcontract at any time, see Def. Ex. 8, it is undisputed that VAIL lacked the power to fire McAdory from ALM Group; all it could do was terminate its relationship with ALM Group. It is further undisputed that plaintiff received her assignments, work hours, and duty station from the Army OBT, not from VAIL personnel.[3] ALM Group, not VAIL, was responsible for keeping all of plaintiff's employment records and withholding her taxes, and covered the fees associated with her training program. Plaintiff only worked with VAIL for one year, on a contract that had a defined end-date,[4] and although the Fourth Circuit has held that the intent factor by itself is of "minimal consequence," Butler, 793 F.3d at 414 n.12, this factor certainly corroborates the conclusion of a contractor-subcontract relationship, because the Subcontract specifically stated that the parties intended for the relationship to be one of subcontractor to contractor.

In short, at most two of the nine Butler factors support plaintiff's characterization of VAIL as her joint employer, in contrast with the seven factors, including the three "most important" ones, which indicate that VAIL was not a joint employer. Accordingly, plaintiff has not demonstrated that VAIL was a joint employer subject to Title VII liability and for this reason defendant is entitled to summary judgment.

### C. Failure to Meet Prima Facie Case

Vail argues that even if plaintiff could establish a joint employer relationship, she has failed to establish a prima facie case of pregnancy discrimination, failed to establish that its

---

[3] Plaintiff has not sued the Army, nor has she argued that it constitutes a joint employer.

[4] There is no evidence that VAIL compensated McAdory for her work on the failed 2012 proposal.

11

legitimate reasons for failing to renew the contract with ALM Group were pretextual, and has not provided any evidence of damages.

A plaintiff claiming pregnancy discrimination without direct evidence[5] must first establish the four elements of a prima facie case by showing that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (internal quotation marks and citation omitted). Once the prima facie case is satisfied, the defendant must articulate a legitimate, non-discriminatory reason for its conduct. Lettieri v. Equant, Inc., 478 F.3d 640, 646 (4th Cir. 2007). The burden then shifts back to the plaintiff, who must establish that the defendant's proffered reason was in fact a pretext for discrimination. Id.

Plaintiff fails to establish both the third and fourth prongs of a prima facie case of pregnancy discrimination. In particular, her conduct in altering the four-month contract offer was not professional. What she calls "redlining" is not supported by the evidence because the contract she returned had every appearance of being a final agreement. As an experienced businesswoman, plaintiff should have known how to propose changes in a manner that did not create the impression that Hudnall had already agreed to her demands. Moreover, plaintiff cannot show that she was "replaced" or that her position remained open because, to the extent that she ever held a position at VAIL, that position was eliminated when Contract D0029-202

---

[5] Plaintiff has stipulated that she has no direct evidence of discrimination. See Pl. SUMF ¶ 94.

was completed.[6] Accordingly, plaintiff has not established a prima facie case of discrimination and the defendant is entitled to summary judgment. For the same reasons, plaintiff cannot establish that the defendant's proffered reason for not renewing the contract with ALM Group—that it found McAdory's conduct during the negotiation to be unprofessional—to be pretextual, particularly given that plaintiff has stipulated that she has no evidence that anyone at VAIL treated her any differently after she announced her pregnancy. In fact, there is strong evidence that she was not discriminated against on the basis of her pregnancy, because, after she announced her pregnancy, ALM Group was offered a four-month extension and plaintiff was told she could apply for a W-2 position with VAIL.

Even if plaintiff could succeed in establishing pregnancy discrimination, she has failed to provide sufficient evidence to sustain her damage claims. The damages plaintiff seeks for unpaid work on June 11, the period of unemployment, and the rejected lines of credit are all actually only claims that ALM Group, not McAdory personally, could make. See Def. SUMF ¶¶ 79, 81; Pl. SUMF ¶¶ 79, 81; Def. Ex. 8, [Dkt. 66-8] (establishing that the Subcontract was between VAIL and ALM Group, not VAIL and McAdory); Def. Ex. 14, [Dkt. 66-14] (establishing that the proposed 2015 subcontract was between VAIL and ALM Group, not VAIL and McAdory). Because plaintiff was denied leave to amend her complaint to add ALM Group as a plaintiff, she cannot pursue damages on its behalf through this civil action.[7] The damages she seeks for the loss of her home are not fairly traceable to the alleged discriminatory behavior,

---

[6] And, of course, there is no suggestion that VAIL eliminated the position to target the plaintiff, because it was contractually defined as a temporary position before plaintiff was hired.

[7] Plaintiff moved to amend her complaint to add ALM Group as a plaintiff on January 18, 2017. [Dkt. 20]. The motion was denied by a magistrate judge, and plaintiff did not appeal that denial. [Dkt. 28].

because plaintiff has stipulated that the foreclosure proceedings began before VAIL decided not to renew its subcontract with ALM Group. Def. SUMF ¶ 87; Pl. SUMF ¶ 87. Similarly, plaintiff's inability to join the Small Business Administration's Section 8(a) program is not attributable to the defendant because plaintiff admits that she has never even applied for, let alone been rejected by, the Section 8(a) program. Id. at ¶ 85.[8] Accordingly, even if plaintiff could establish that VAIL had discriminated against her because she was pregnant, she would not be entitled to recover any damages and the defendant is therefore entitled to summary judgment on this basis as well.

### III. CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion. Plaintiff has also filed three additional motions related to the trial,[9] which will be denied as moot in light of defendant having been granted summary judgment.

Entered this 4th day of May, 2017.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge

---

[8] To the extent that plaintiff seeks damages to compensate for her miscarriage, she has stipulated that hers was a high-risk pregnancy because of cysts unrelated to defendant's conduct, Def. SUMF ¶ 92; Pl. SUMF ¶ 92, and she has provided no medical evidence to support her claim that the miscarriage was induced by stress resulting from VAIL's failure to renew the contract with ALM Group.

[9] Motion to Request Subopoenas [Dkt. 78]; Motion to Request an Assistant During Trial [Dkt. 79]; Motion to Request Additional Exhibits for Trial [Dkt. 80].